Fei Fei Fan
100 Avenue G Apt 568G
Bayonne, NJ 07002
(404) 432-4868
litmus9@msn.com
feifei.fan@hotmail.com
Pro Se Litigant

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| FEI FEI FAN,<br>　　　　　　　　Plaintiff,<br>vs.<br><br>State of Nevada Ex Rel. Board of Regents of the Nevada System of Higher Education, On Behalf of the University of Nevada, Reno,<br>　　　　　　　　Defendant. | Case No.: 3:24-cv-00427-MMD-CLB<br><br>**First Amended Complaint And Demand for Jury Trial** |

Plaintiff FEI FEI FAN submits this First Amended Complaint against Defendant University of Nevada, Reno (UNR), and alleges as follows.

### I. INTRODUCTION AND NATURE OF THE CASE

1. This case arises from UNR's systemic failure to address coercive power dynamics between higher-ranking faculty, athletic coaches, and administrators and their subordinates.

2. The risk was most acute where the subordinate's immigration status and continued employment depended on those in positions of institutional authority.

3. Plaintiff, a Chinese female tenure-track professor, worked under the authority of a senior tenured faculty member with evaluative control over her performance, contract renewals, and tenure trajectory.

4. UNR had prior institutional knowledge that such superior–subordinate relationships carried significant structural risks, yet implemented no safeguards to mitigate them.

5. Permissive oversight, lack of meaningful supervision or boundaries, and internal adjudication processes with limited independence allowed higher-ranking personnel to act without accountability and shielded them from external scrutiny.

6. In early 2021, after years of professional dependence and institutional silence deterred earlier disclosure, Plaintiff reported her concerns through official channels.

1

7.    UNR responded with procedural exclusion and adverse internal findings based on records Plaintiff was never allowed to review or contest.

8.    These events occurred within, and were reinforced by, a broader institutional pattern of tolerating high-risk conduct by higher-ranking personnel and failing to address prior complaints—policies and practices that foreseeably exposed Plaintiff to coercion, retaliation, and professional harm.

9.    Plaintiff brings this action under federal and state law to remedy the harms described above and demands a jury trial on all issues so triable.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, including Title IX, Title VII, and the Trafficking Victims Protection Reauthorization Act (TVPRA).

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides here and a substantial part of the events giving rise to these claims occurred in this District.

## III. TIMELINESS OF CLAIMS

12. All claims asserted herein are timely under the applicable statutes of limitations for the federal causes of action pled, including Title IX, Title VII, and the Trafficking Victims Protection Reauthorization Act. Plaintiff further pleads and preserves all equitable tolling doctrines and accrual principles available under federal law, including but not limited to the discovery rule, the continuing violation doctrine, and fraudulent concealment.

## IV. PARTIES

13. Plaintiff Fei Fei Fan is an individual who was employed by UNR from 2015 to 2024, first as a tenure-track and later as a tenured professor.

14. Defendant State of Nevada ex rel. Board of Regents of the Nevada System of Higher Education, which operates UNR, is a public university and an instrumentality of the State of Nevada.

15. UNR receives federal funding within the meaning of Title IX and is subject to Title IX, Title VII, and the Trafficking Victims Protection Reauthorization Act (TVPRA).

16. At all relevant times, Defendant acted under color of state law and exercised supervisory authority over Plaintiff's employment, professional standing, and access to internal grievance procedures.

2

## V. FACTUAL ALLEGATIONS

### A. Background: Power Imbalance and Dependency

17. Plaintiff joined UNR in 2015 as a probationary, tenure-track Assistant Professor, earning tenure in 2021 and remaining employed until her termination in 2024.

18. Plaintiff's ability to live and work in the United States—and to remain in her field—depended on UNR's immigration sponsorship, including H-1B petitions and green-card support.

19. Jiang, a tenured professor who had previously supervised Plaintiff in graduate school, retained evaluative authority over her course assignments, internal funding, recommendations, and performance reviews affecting reappointment, merit pay, and promotion, and served on key committees overseeing contract renewals and tenure decisions without recusal or oversight.

20. From July 2015 through December 2019, while holding evaluative authority, Jiang obtained sexual acts and services from Plaintiff under conditions of power imbalance, employment dependency, and absence of institutional safeguards.

21. Given Jiang's control over her evaluations and institutional recommendations, Plaintiff reasonably believed that ending the sexual acts or services provided to him would jeopardize her legal status, and end her career, with no safe channel for complaint.

22. Jiang concealed the relationship from UNR officials and records, avoiding conflict-of-interest disclosures or recusal.

23. UNR maintained no effective safeguards to protect subordinates from personnel with evaluative authority who sought sexual access, and routinely failed to enforce recusal or disclosure requirements.

24. As reflected in public records and in Plaintiff's own experience, UNR has engaged in a longstanding pattern of shielding higher-ranking male faculty, athletic coaches, and administrators from accountability, while retaliating against those who report misconduct.

### B. Complaint and Immediate Institutional Response

25. In December 2020, UNR recommended Plaintiff for tenure to the Board of Regents, with final approval pending.

26. In January 2021, Plaintiff submitted a formal Title IX complaint to UNR identifying Jiang's evaluative roles and raising concerns about coercion and lack of procedural safeguards.

27. UNR acknowledged receipt but took no protective action, allowing Jiang to remain on committees and in other evaluative roles affecting Plaintiff's career.

3

28. In May 2021, UNR imposed interim restrictions on Plaintiff, while leaving Jiang's roles and privileges intact.

**C. Irregularities and Misconduct in the Investigation**

29. In March 2021, UNR Title IX investigator Stephanie Augdahl began interviewing Plaintiff regarding her complaint.

30. During the interviews, Augdahl engaged in humiliating and irrelevant sexual questioning, including whether Plaintiff was a virgin and whether she had engaged in sexual relations with other men.

31. During the interviews, Augdahl pressured Plaintiff to accept that, absent explicit resistance, her sexual interactions with Jiang would be deemed "consensual," notwithstanding Plaintiff's statements that they occurred under coercive power dynamics.

32. Despite already possessing evidence that Jiang had engaged in sexual relations with Plaintiff, Augdahl demanded production of an intimate sexual video.

33. Plaintiff described the video's contents and objected that disclosure would expose highly private material; Augdahl nevertheless insisted. Under institutional pressure, Plaintiff complied.

34. UNR subsequently disseminated the video without safeguards, granting access to individuals both inside and outside the University, including Title IX staff, administrators, investigators from TNG, outside counsel retained by UNR, counsel for Jiang, and judicial decision-makers.

35. This dissemination occurred without Plaintiff's consent and contrary to assurances of confidentiality, compounding humiliation, privacy invasion, and professional harm.

36. UNR declined to contact any witnesses identified by Plaintiff, refused to accept evidence she submitted, and instead relied exclusively on witnesses and materials provided by Jiang, adopting his narrative wholesale.

37. In violation of Title IX's procedural requirements, UNR withheld Augdahl's interview notes from Plaintiff and denied her the ability to review or approve her own interview summary.

38. Plaintiff was not invited to correct errors or add clarifications to her own interview summary. By contrast, Jiang was not subjected to an internal interview at all, but instead was permitted to submit a written narrative and supporting materials on his own terms.

39. In late 2022, UNR retained TNG—a consulting firm that markets to schools for managing and defending against complaints—as the "independent" investigator in Plaintiff's case.

40. In March 2023, Plaintiff first learned of the Augdahl notes through TNG's document production. Although TNG nominally allowed her to submit a rebuttal, the submission had no effect on the predetermined outcome.

41. The TNG investigation did not originate as an independent inquiry. Instead, TNG worked from a draft report prepared by UNR's Title IX investigator, modifying it to preserve UNR's predetermined findings while presenting them in a form calculated to limit UNR's legal exposure.

42. The final TNG report relied directly on Augdahl's interview notes, which included purported details from events more than a decade earlier that were factually inaccurate yet matched Jiang's May 2021 written submission with unusual precision.

43. In other contexts, Jiang had claimed he could not recall many of these same events. The extraordinary alignment between his account and UNR's notes—despite his professed lack of memory—suggests the notes were prepared after receiving Jiang's account and tailored to match it.

44. These notes misrepresented Plaintiff's statements and became the foundation for subsequent adverse actions.

45. Throughout the process, Plaintiff remained under restrictive interim measures, while Jiang retained departmental and college-level roles that allowed him to influence evaluations and institutional decisions.

46. At the December 2023 hearing, the hearing officer, Sandra C. Ketner, denied Plaintiff's request to participate remotely and removed Plaintiff and her attorney from the Zoom meeting room—further undermining her ability to participate on equal footing.

47. On the record, Ketner stated that UNR had never terminated a faculty member for sexual harassment, revealing knowledge of and alignment with UNR's longstanding reluctance to hold higher-ranking personnel accountable.

**D. Institutional Bias and Deficiencies in External Investigation**

48. Prior complaints of misconduct by higher-ranking personnel at UNR followed a consistent pattern: the accused were not removed from evaluative roles, and no new disclosure or recusal requirements were adopted.

49. Officials with decision-making authority often had longstanding professional connections to the accused, including prior service together on committees, collaboration on research projects, and past or ongoing supervisory relationships—compromising any appearance of impartiality.

5

50. Hearing officers and investigators were frequently drawn from law firms and adjudicators regularly engaged by NSHE or its member institutions, undermining any claim of independence.

51. Despite the availability of external investigators with no institutional ties, UNR did not retain any in Plaintiff's case.

52. This absence of independent review persisted after Plaintiff's 2021 complaint, ensuring that adjudication remained within the same institutional network.

**E. Resulting Harm and Ongoing Effects**

53. Plaintiff's research program and laboratory operations were disrupted during the investigation.

54. Professional isolation increased as colleagues avoided collaboration during the proceedings.

55. Plaintiff suffered economic harm, including loss of salary and benefits upon termination, and has been unable to secure comparable academic employment.

56. Plaintiff's reputation in the academic community was damaged and continues to suffer, affecting references, collaborations, and future opportunities.

57. Plaintiff experienced severe anxiety, sleep disruption, difficulty concentrating, and panic attacks, consistent with post-traumatic stress.

58. These harms have continued beyond the end of Plaintiff's UNR employment and are ongoing.

**VI. CLAIMS FOR RELIEF**

**Count I – Title IX Retaliation (20 U.S.C. § 1681 et seq.)**

59. This claim arises under Title IX, 20 U.S.C. § 1681 et seq. Defendant is a Title IX funding recipient subject to its requirements.

60. Retaliation for complaining about sex discrimination — including sexual harassment, coercion, or other sex-based misconduct — is discrimination "on the basis of sex" under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

61. The governing regulation independently prohibits retaliation and incorporates 34 C.F.R. § 100.7(e). See 34 C.F.R. § 106.71.

62. A Title IX retaliation claim requires plausible allegations that: (1) Plaintiff engaged in protected activity; (2) she thereafter faced a materially adverse action—i.e., one that would dissuade a reasonable person from complaining; and (3) causation, with Defendant's

decisionmakers aware of the protected activity. *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Plaintiff pleads causation under any applicable standard, including but-for causation.

**Element 1 – Protected Activity**

63. Plaintiff engaged in protected activity in January 2021 when she submitted a Title IX complaint to UNR regarding the conduct of a senior faculty member who retained evaluative authority over her work, research, and advancement.

**Element 2 – Materially Adverse Action**

64. After Plaintiff's complaint, UNR imposed and maintained materially adverse measures, including a biased investigatory process, and severe invasions of sexual privacy, depriving her of a fair and impartial proceeding.

65. UNR's investigator prepared interview notes that materially mischaracterized Plaintiff's statements, including attributing statements she did not make, and omitted context central to coercion tied to visa and tenure leverage.

66. The notes closely tracked the accused professor's written narrative and minimized Plaintiff's detailed account of power-based coercion, thereby skewing the evidentiary record from the outset.

67. UNR demanded highly intimate video evidence despite existing corroboration, and then disseminated that material without adequate safeguards to internal and external recipients of the Title IX file, causing lasting privacy harm.

68. The investigation declined to contact Plaintiff's identified witnesses and refused to meaningfully consider her submissions, while crediting only witnesses and materials supplied by the accused, effectively predetermining the record against her.

69. UNR compounded these harms by withholding critical investigatory and hearing materials, excluding Plaintiff from meaningful participation (including at the December 2023 hearing), and culminating in the termination of her tenured appointment in 2024.

70. Considered individually and collectively, these measures are "materially adverse" because they would dissuade a reasonable person from reporting sexual harassment, coercion, or other sex-based misconduct and strike at core professional, reputational, and privacy interests. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

**Element 3 – Causal Link (and Knowledge)**

71. UNR had actual knowledge of Plaintiff's protected activity through its Title IX office and senior administrators upon receipt of her January 2021 complaint; the decisionmakers who imposed the challenged measures were directly informed and participated in subsequent steps.

72. The adverse measures followed in close temporal proximity, persisted in a continuous course through Plaintiff's 2024 termination, and were accompanied by procedural deviations and comparative advantages granted to the accused (e.g., retaining evaluative roles; selective crediting of Jiang's submissions).

73. This timing, continuity, and pattern of policy departures and one-sided process support a strong inference that Plaintiff's protected activity was a motivating factor—and, under any applicable standard, including but-for causation—a cause of the adverse actions.

**Conclusion and Damages**

74. The foregoing allegations satisfy all elements of a Title IX retaliation claim and show that Defendant engaged in unlawful retaliation for Plaintiff's protected activity, in violation of 20 U.S.C. § 1681 (and implementing regulations, 34 C.F.R. Part 106).

75. As a direct and proximate result, Plaintiff suffered loss of tenured employment, significant economic injury, irreparable harm to professional standing and career trajectory, and severe emotional distress.

76. These harms were the natural and foreseeable consequence of Defendant's retaliatory acts and are remediable only in part by monetary damages.

77. Plaintiff seeks all legal and equitable relief available under Title IX, including compensatory damages, reinstatement or front pay, injunctive relief, attorney's fees, and such other relief as the Court deems just and proper.

**Count II – Title IX Hostile Environment / Deliberate Indifference (20 U.S.C. § 1681 et seq.)**

78. This claim arises under Title IX, 20 U.S.C. § 1681(a), and its implementing regulations, 34 C.F.R. Part 106, which prohibit sex discrimination in federally funded education programs or activities, including employment within such programs or activities.

79. Consistent with *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), and *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), a funding recipient is liable in damages where an official with authority to institute corrective measures has actual knowledge of sex-based harassment and responds with deliberate indifference—i.e., in a manner clearly unreasonable in light of known circumstances. In the employment context, hostile environment is actionable where

8

the conduct is severe or pervasive; in the student-facing *Davis* context, courts describe actionable harassment as severe, pervasive, and objectively offensive such that it effectively denies equal access to a program or activity.

80. To state a Title IX hostile-environment claim based on deliberate indifference, Plaintiff pleads that: (1) she was subjected to harassment based on sex; (2) the harassment was severe or pervasive (in the employment context) or, in the alternative, severe, pervasive, and objectively offensive so as to effectively deny equal access to a University program or activity; (3) an appropriate University official with authority to take corrective action had actual knowledge; (4) UNR responded with deliberate indifference—conduct that was clearly unreasonable given what it knew; and (5) as a result, Plaintiff was deprived of equal access to University programs or activities, including terms, conditions, and benefits of employment.

**Element 1 – Sex-Based Harassment**

81. Plaintiff was placed under the evaluative authority of Professor Jiang, who controlled her tenure vote, research opportunities, and H-1B visa status.

82. Between July 2015 and December 2019, Jiang maintained a coercive, sex-based relationship, conditioning academic and professional benefits on Plaintiff's submission to sexual demands.

83. The hostile environment persisted into 2020 due to Jiang's continuing authority and threats to Plaintiff's career and immigration status, which deterred earlier reporting.

84. After Plaintiff's January 2021 complaint, UNR's Title IX investigator compounded the sex-based hostility by subjecting Plaintiff to humiliating and intrusive questioning, including demands for explicit sexual video evidence without safeguards, materially mischaracterizing interview notes, and disregarding her detailed account of coercion in favor of Jiang's narrative.

85. These actions constituted and perpetuated a sex-based hostile environment within the meaning of Title IX.

**Element 2 – Severe, Pervasive, and Objectively Offensive**

86. Jiang's coercive conduct persisted for years under his evaluative control, was compounded by the absence of institutional safeguards, and escalated during UNR's Title IX investigation.

87. The investigator's conduct included degrading inquiries into irrelevant matters such as Plaintiff's virginity and sexual history with others, amplifying the hostile environment.

88. This conduct was sufficiently severe, pervasive, and objectively offensive to alter the

conditions of Plaintiff's employment and deny her equal access to University programs and activities.

**Element 3 – Actual Knowledge**

89. UNR had actual knowledge of the harassment no later than January 2021, when Plaintiff submitted a Title IX complaint detailing Jiang's conduct, his evaluative authority, and the coercive conditions affecting her career and immigration status.

90. The officials with such knowledge included the Title IX Coordinator and senior administrators—"appropriate persons" with authority to institute corrective measures under Title IX.

91. This knowledge was reinforced by UNR's prior handling of other complaints involving higher-ranking male faculty and athletic staff, reflecting institutional awareness of similar risks.

**Element 4 – Deliberate Indifference**

92. Despite actual knowledge, UNR retained Jiang in evaluative roles for years after the complaint and conducted investigative proceedings that excluded Plaintiff from meaningful participation.

93. UNR relied exclusively on Jiang's witnesses and materials, refused to interview Plaintiff's witnesses, denied her access to critical evidence, and allowed investigative notes to be shaped to match Jiang's written account.

94. Public records show that, before 2024, UNR had declined to remove other higher-ranking male faculty and athletic staff accused of sexual harassment, reflecting an institutional tolerance of such conduct.

95. Such actions and omissions were clearly unreasonable in light of known circumstances and therefore constitute deliberate indifference under *Gebser* and *Davis*.

**Element 5 – Denial of Equal Access and Procedural Disparities**

96. The hostile environment and institutional inaction deprived Plaintiff of equal access to the terms, benefits, and privileges of her tenured faculty position.

97. Plaintiff was denied access to interview summaries, prevented from reviewing or correcting investigative records, and, although nominally permitted to submit additional evidence, that evidence was disregarded and excluded from meaningful consideration.

98. She was excluded from the disciplinary hearing.

99. Decision-making authority remained with individuals who had longstanding professional

ties to Defendant, and UNR did not engage independent investigators in complaints involving higher-ranking male faculty.

100. Public records confirm that, prior to 2024, UNR repeatedly declined to remove such faculty or athletic staff accused of sexual harassment, reflecting institutional tolerance of such conduct.

101. These procedural disparities—including denial of access to evidence, exclusion from meaningful participation, and concentration of decision-making authority among administrators—occurred within an institutional pattern of protecting higher-ranking male faculty while restricting female complainants.

102. Collectively, they reinforced the hostile environment, deprived Plaintiff of equal access because of sex, and reflected a systemic failure to provide fundamental fairness and impartial adjudication (further addressed in Count III).

**Conclusion and Damages**

103. Defendant's actions and omissions created and perpetuated a sex-based hostile environment and, despite actual notice, amounted to deliberate indifference—i.e., responses clearly unreasonable in light of the known circumstances—in violation of Title IX, 20 U.S.C. § 1681(a), and 34 C.F.R. Part 106.

104. As a direct and proximate result, Plaintiff was denied equal access to the terms, benefits, and privileges of her faculty appointment, and suffered termination of employment, reputational harm, and severe emotional distress.

105. Plaintiff seeks all relief available under Title IX, including compensatory damages, injunctive and equitable relief, and reasonable attorney's fees and costs.

**Count III – 18 U.S.C. § 1589(b) (TVPRA – Beneficiary Liability for Forced Labor)**

106. This claim arises under the civil remedy provision of the TVPRA, 18 U.S.C. § 1595(a), predicated on violations of 18 U.S.C. § 1589(b).

107. Section 1589(b) defines the underlying prohibited conduct. Civil beneficiary liability is provided by 18 U.S.C. § 1595(a), which permits recovery from one who knowingly benefits from participation in a venture that the person "knew or should have known" was engaged in conduct violating § 1589.

108. To state a claim under § 1589(b) via § 1595(a), Plaintiff alleges: (1) a venture that obtained "labor or services" through means prohibited by § 1589(a); (2) Defendant knowingly

11

benefited, financially or otherwise, from participation in that venture; and (3) Defendant knew or should have known that the venture obtained labor or services by such prohibited means (and, alternatively, acted in reckless disregard of that fact).

**Element 1 – Existence of a Venture Engaged in Forced Labor**

109.     UNR and senior personnel—including Professor Jiang—participated in an academic and research venture (UNR's engineering program and associated labs) that obtained Plaintiff's labor and services, including sexual services, teaching, research, and service work, for UNR's institutional benefit.

110.     From July 2015 through December 2019, while vested with evaluative authority over Plaintiff's tenure trajectory, internal funding, and visa-related institutional sponsorship, Jiang compelled Plaintiff's continued provision of sexual services by means prohibited by § 1589(a), including: threats of "serious harm" as defined in § 1589(c)(2), namely loss of tenure prospects, and employment and a scheme, plan, or pattern intended to cause Plaintiff to believe that noncompliance would result in serious harm.

111.     Although Plaintiff ceased providing sexual services by December 2019, the venture persisted. After Plaintiff's January 2021 Title IX complaint, UNR's handling of the matter—maintaining Jiang's institutional roles and conducting a biased process—preserved and concealed the coercive conditions and continued to extract Plaintiff's professional services in an environment marked by retaliation and intimidation.

**Element 2 – Knowing Benefit**

112.     UNR knowingly benefited—financially and through other things of value—from participation in the venture by concealing and failing to halt the coercion exerted through Jiang's evaluative authority, thereby preserving the appearance of normal operations and avoiding reputational and legal consequences.

113.     As a result, UNR continued to reap tuition revenue, research publications associated with UNR, grant funding and indirect cost recoveries, service contributions, rankings/field prestige, and other institutional advantages derived from Plaintiff's and Jiang's output during the period of coercion and thereafter.

114.     Those benefits accrued both while the coercion was ongoing and after Plaintiff's formal complaint, as the concealment and outcome-control allowed the venture to keep profiting from Plaintiff's labor and services.

**Element 3 – Knowledge or Should-Have-Known**

115.    UNR had actual knowledge no later than January 2021 through Plaintiff's Title IX complaint detailing coercion tied to evaluative power and immigration sponsorship, and in any event should have known based on the information then before it.

116.    For years before Plaintiff's complaint, UNR should have known—and at minimum acted in reckless disregard—of the material risk that higher-ranking male personnel engaged in sexual coercion or harassment of subordinates and students, as reflected in prior lawsuits, internal matters, and public reporting concerning UNR.

117.    Despite this actual and constructive knowledge and Plaintiff's specific allegations, UNR took no meaningful protective action: it left decision-making with insiders, declined to engage a truly independent investigator for complaints involving high-status faculty, and implemented procedures that discouraged exposure of misconduct and shielded the institution.

118.    While knowingly benefiting, UNR preserved—and continued to capitalize on— "anything of value" flowing from (a) Professor Jiang's academic output, including UNR-branded publications, grant awards and indirect cost recoveries, tuition-generating programs, and field prestige/rankings; and (b) the avoidance of reputational harm and institutional disruption that public disclosure of the coercion would have triggered.

**Conclusion and Damages**

119.    By knowingly benefiting—financially and through anything of value—from participation in a venture engaged in obtaining Plaintiff's labor and services by means prohibited by 18 U.S.C. § 1589(a), while knowing or recklessly disregarding that fact, Defendant UNR is liable under 18 U.S.C. §§ 1589(b) and 1595(a).

120.    The coercion and abuse described above caused severe emotional distress and other damages, and UNR's subsequent reliance on trauma-driven communications as a pretext to terminate Plaintiff resulted in loss of her tenured appointment, destruction of her professional standing, and further emotional and economic harm.

121.    Plaintiff seeks all damages, equitable relief, and attorney's fees permitted under the TVPRA, including compensation for continuing harms sustained during and after the period of direct coercion.

### Count IV – Title VII Retaliation (42 U.S.C. § 2000e-3(a))

122.    This claim arises under Title VII, 42 U.S.C. § 2000e-3(a), which makes it unlawful

for an employer to retaliate against an employee because she opposed sex discrimination or sexual harassment in the terms and conditions of employment, or because she made a good-faith complaint about such conduct.

123.     To state a Title VII retaliation claim, Plaintiff alleges: (1) she engaged in protected opposition; (2) Defendant subjected her to materially adverse actions—i.e., actions that might dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) but-for causation links her protected activity to the adverse actions. See *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

124.     Plaintiff timely exhausted administrative remedies by filing a dual-filed Charge with NERC/EEOC in June 2024, receiving Right-to-Sue notices, and filing this action within 90 days of the EEOC notice.

**Element 1 – Protected Activity**

125.     In January 2021, Plaintiff engaged in protected activity under Title VII by filing a formal complaint with UNR's Title IX office, alleging sex-based misconduct and institutional conflicts of interest by a senior faculty member with evaluative authority over her work, research, and advancement. This constituted opposition to unlawful employment practices within the meaning of 42 U.S.C. § 2000e-3(a).

**Element 2 – Materially Adverse Action**

126.     Following this protected activity, UNR took actions that, under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), would dissuade a reasonable employee from making or supporting a discrimination complaint.

127.     Within weeks of the complaint, UNR's Title IX investigator conducted an interview marked by humiliating and invasive sexual-history questions, materially mischaracterized sexual conduct occurring under coercive, power-imbalance conditions as "consensual," and demanded an intimate sexual video despite Plaintiff's stated privacy concerns.

128.     UNR then disseminated the coerced video and related records—without confidentiality safeguards—to administrators, the accused faculty member and his counsel, outside investigators, and decision-makers in later proceedings.

129.     Throughout the process, UNR denied Plaintiff access to investigative and hearing materials, refused to interview her identified witnesses, relied exclusively on witnesses and

14

materials provided by the accused, and excluded her entirely from the disciplinary hearing.

130.    In 2024, UNR terminated Plaintiff's tenured position, ending her academic career and employer-sponsored immigration status.

**Element 3 – Causal Connection and Pretext**

131.    The adverse actions began within weeks of Plaintiff's protected activity, persisted until termination, and were accompanied by procedural disparities favoring the accused.

132.    UNR relied on 2020–February 2021 communications that remained unused until May 2021, when Jiang submitted them only after Plaintiff's Title IX complaint. Elevating these previously unasserted communications into a termination basis—immediately after the protected report—supports an inference of post-hoc pretext when viewed with the surrounding procedural disparities.

133.    Such close temporal proximity, combined with reliance on previously tolerated or stale conduct, supports an inference of retaliatory motive. See *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895–96 (9th Cir. 2005).

134.    Additional indicia of pretext include: (a) amending UNR's faculty-termination policy in July 2023 and applying it retroactively while excluding Plaintiff from the hearing process in December 2023; (b) disparate treatment of comparable or more serious conduct by faculty who had not engaged in protected activity; and (c) shifting explanations, from vague misconduct allegations to selective excerpts stripped of cultural and linguistic context and divorced from the trauma dynamics documented in Plaintiff's complaint.

135.    Alternatively, UNR's decision-makers acted as conduits ("cat's paw") for biased subordinates or investigators opposed to Plaintiff's protected activity, whose incomplete or misleading submissions were a proximate cause of the termination decision. See *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011); *Poland v. Chertoff*, 494 F.3d 1174, 1182–83 (9th Cir. 2007).

136.    Under *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), but for Plaintiff's protected activity, UNR would not have initiated or pursued termination on the stated grounds.

**Conclusion and Damages**

137.    Defendant retaliated against Plaintiff for her protected activity, in violation of 42 U.S.C. § 2000e-3(a). The timing, procedural disparities, reliance on stale and previously tolerated conduct, exclusion from the hearing, and refusal to consider Plaintiff's evidence show that, but for her protected activity, UNR would not have pursued termination.

138.     As a direct result, Plaintiff lost her tenured appointment, wages, benefits, research funding, employer-sponsored immigration status, and professional standing, and suffered severe emotional distress.

139.     Plaintiff seeks all relief available under Title VII, including compensatory damages, reinstatement or front pay, equitable restoration of professional status, and reasonable attorney's fees and costs.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief:

1. Compensatory Damages — for emotional distress, reputational harm, economic loss, and loss of career opportunities, as authorized by Title IX, Title VII, and the TVPRA.

2. Punitive Damages — to the extent permitted by law, including under the TVPRA, in an amount sufficient to punish and deter.

3. Equitable Relief, including but not limited to:

   a. Expungement of adverse findings and records related to Plaintiff's protected activity;

   b. Reinstatement to her tenured faculty position or, in the alternative, front pay;

   c. Implementation of effective policies, procedures, and training to prevent recurrence of unlawful practices.

4. Declaratory Judgment — that Defendant's acts and omissions violated Plaintiff's rights under Title IX, Title VII, and the TVPRA.

5. Pre- and Post-Judgment Interest as allowed by law.

6. Attorney's Fees and Costs pursuant to 42 U.S.C. §§ 1988, 2000e-5(k), 20 U.S.C. § 1681 et seq., 18 U.S.C. § 1595, and other applicable law.

7. Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated:  August 8, 2025

_Fei Fei Fan_

Fei Fei Fan

*Pro Se*

16

Fei Fei Fan
100 Avenue G Apt 568G
Bayonne, NJ 07002
(404) 432-4868
litmus9@msn.com
feifei.fan@hotmail.com
*Pro Se Litigant*

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEI FEI FAN,<br>                Plaintiff,<br>vs.<br><br>State of Nevada Ex Rel. Board of Regents of the Nevada System of Higher Education, On Behalf of the University of Nevada, Reno,<br>                Defendant. | Case No.: 3:24-cv-00427-MMD-CLB |

## CERTIFICATE OF SERVICE

I, Fei Fei Fan, certify that on August 8, 2025, I served the following document(s):

- First Amended Complaint

on the following individuals by Electronic Filing (via CM/ECF system) indicated:

1. Frank Z LaForge (Defendant's Attorney).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Respectfully submitted,

Dated:  August 8, 2025

*Fei Fei Fan.*
_____
Fei Fei Fan

*Pro Se*